# VICTORIA A. JOHNSON v. VALIDO MARBLE CO. ET AL.

*Equitable lien of mortgagee to insurance money. Prior mortgagee not bound to notice subsequent record. What facts will put upon inquiry. When principal affected by knowledge of agent. Wife not bound by acts of hus-band without her authority. Priority of liens. Evidence. Husband and wife. Party may testify to capacity in which he acted, if disclosed.*

Adams held a first mortgage against the property of the Valido Marble Company, of which the husband of the oratrix was treasurer and general manager. The defendants held a second mortgage from that company of the same premises to secure the payment of certain bonds ; and this second mortgage contained a stipulation that the mortgagor should keep the premises insured for the benefit of the mortgagees. Adams had begun a foreclosure of his mortgage previously to the making of the defendants' mortgage. After the decree of Adams had become absolute, but in virtue of an arrangement made with him before, the oratrix paid him the amount of his decree and took from him a quit-claim deed of the premises. Her husband acted as her agent in paying the money and taking the conveyance. After taking this conveyance she gave to the Valido Company a written obligation, that she would re-convey to it upon being repaid the amounts advanced by her, and still later executed a conditional deed of that tenor. By these instruments it was provided that the company should keep the premises insured for her benefit, and that in the event of loss the insurance money might, if the parties agreed, be used in rebuilding the premises. The company did so insure the premises, the buildings were destroyed by fire; and an amount of insurance was paid sufficient to satisfy the entire debt of the oratrix, and was by her passed over to the company to be used in rebuilding, but was not in fact used for that purpose. The husband of the oratrix acted as her agent in settling with the insurance companies. The oratrix did not know of the defendants' mortgage but did know that

22

there were outstanding bonds against the company. *Held,* that the fact that the oratrix suffered the company to retain the insurance money did not work a payment of her debt, nor estop her from asserting the same as a prior lien against the defendants, for

1. While, if the mortgagor convenants to keep the mortgaged premises insured for the benefit of the mortgagee, the mortgagee will have an equitable lien as against the mortgagor upon the proceeds of an insurance actually affected, although not in terms for the benefit of the mortgagee ;

2. Still such lien will not be good as against a prior mortgagee, who neither has nor ought to have knowledge of the subsequent mortgage.

3. The record of the second mortgage was not constructive notice to the oratrix.

4. Nor was knowledge of the fact that bonds were outstanding sufficient to put her upon inquiry as to how those bonds were secured, or whether they were secured at all.

5. She did not stand affected with the knowledge of her husband since the matters in which he acted as her agent in no way involved the existence of the defendants' mortgage.

6. Nor would she be bound by an agreement which he executed in reference to these matters without her authority.

7. The checks for the insurance money were made payable to the order of the oratrix, and were by her endorsed and delivered to her husband, as the general manager of the Valido Company. He in fact deposited them to the credit of the oratrix, and drew the proceeds out upon checks signed in blank by her, but without her knowledge that the money had been so deposited or for what purpose the checks were to be used. *Held,* that the rights of the oratrix were not thereby affected.

8. At the time the defendants took their mortgage Adams had an attachment lien against the premises which subsequently became a judgment lien maturing before the decree of forclosure became absolute. The amount of the judgment was something more than $3000, and the amount of the decree something less than $10,000, the two aggregating over $13,000. The oratrix arranged with her husband, as the manager of the Valido Company, that she would advance $13,000 to pay off these encumbrances and take the security of Adams. Pursuant to this arrangement she paid her husband $3,000 for the Valido Company, and that company with this and additional money of its

Victoria A. Johnson *v.* Valido Marble Co. *et al.*

own paid the judgment. Later she paid her husband $10,000 more to satisfy the decree. After the decree had become absolute in Adams, he was paid the amount of his decree, being less than $10,000, and thereupon quit-claimed to the oratrix; who agreed to re-deed to the Valido Company, upon re-payment of the entire $13,000. *Held*, that the oratrix thereby acquired a lien superior to the defendants' mortgage to the extent of the entire $13,000.

9. Her husband might properly testify in behalf of the oratrix to matters in which he did not act as her agent, unless objection was made thereto for that he was her husband. *Held*, that the objection interposed in this case to his testimony was not upon that ground.

10. He might so testify that the insurance money drawn from the bank upon the blank checks of the oratrix was used for the benefit of the Valido Company without producing the checks.

11. He might also testify that he received the checks for the insurance money from the oratrix as the manager and in behalf of the Valido Company, and not as her agent.

Bill in chancery to foreclose a lien in the nature of a mortgage. Heard upon bill, answers, and a master's report at the September term, 1891. Thompson, Chancellor, dismissed the bill *pro forma*. The oratrix appeals.

From the master's report the following facts appear:

In the year 1884 the premises in question were owned by one Adams, who, on the 1st day of July in that year conveyed the same to the Valido Marble Company by deed conditioned for the payment of certain promissory notes. On the 18th day of December, 1885, Adams began an action at law against the Valido Company and attached the premises in question; said suit was made returnable to the Rutland County Court, and was there prosecuted from term to term until at the January term of the Supreme Court, 1889, he obtained judgment, and on the 21st day of January, 1889, execution issued in his favor for the sum of $3,839.84 damages and costs.

Soon after beginning his suit at law Adams also instituted proceedings to foreclose his conditional deed, the terms of which had not been complied with by the Valido Company, and on

the 10th day of April, 1888, he obtained a decree against the premises for $8,875.68, on or before one year from date with interest from the date of the decree.

November 10, 1887, the Valido Marble Co., by deed of that date properly executed, mortgaged to the defendants, Harmon and Cheney, as trustees, the premises in question to secure the payment of seventy-five bonds of $1,000 each, which were to be issued under the provisions of said mortgage. This deed was duly recorded and the bonds described therein were issued from time to time, and were outstanding and unpaid; of these the defendants, Guy H. Reynolds and John B. Reynolds, were the owners of about one-half, the balance being held by parties whose names did not appear.

William H. Johnson, the husband of the oratrix, was in the spring of 1889, and had been for some time the treasurer and general manager of the Valido Marble Co. As such he made efforts from time to time to raise the funds necessary to pay off the execution and decree of Adams, as aforesaid, but without success. As the time when these liens would become absolute drew near, the said William H. Johnson, being unable to raise the money with which to satisfy them, and being apprehensive that the property would go in satisfaction of these liens, applied to his wife, the oratrix, representing to her that the two liens amounted to about $13,000; that the security was ample, and requested her to advance the sum of $13,000 for the payment of said liens, she to take the security then held by Adams, which was a first lien upon the property. The oratrix replied that she had not then, February, 1889, $13,000 at her command, but that if some arrangement could be made by which a portion of this sum could be paid then, and the balance later, she could and would comply with the request of her husband. Thereupon her husband sought an interview with the solicitor of Adams, for the purpose of ascertaining whether some arrangement might not be made for a delay as to the payment of a portion of the indebted-

ness, and was informed by him that if the amount of the execution was paid then, some further time might be given upon the decree, but no definite arrangement was then concluded. In accordance with this suggestion, the oratrix early in the month of February delivered to her husband $3,000, with which to help pay the execution, upon the understanding that she was to raise the remaining $10,000 with which to pay the balance due upon the execution and decree, and that she was to take Adams' security as to the whole $13,000. The $3,000 so furnished by the oratrix was used by her husband in paying the Adams execution, the balance due upon it being paid by him out of other funds from some other source. This payment was made on the 18th day of February, 1889.

Subsequent to the time when the oratrix advanced the $3,000 to apply upon the execution, an arrangement was made between the oratrix and Adams, the oratrix acting through one Maynard, as her agent, to the effect that the decree should be allowed to become absolute, that within a certain time Adams should be paid the amount due on his decree with interest, and should thereupon quit-claim the premises to said Maynard, who in his turn was to convey them to the oratrix. In pursuance of this understanding the decree was allowed to become absolute, Adams was paid the amount his due on the same, and did on the 10th day of June, 1889, quit-claim the property to Maynard, who, on the same day, quit-claimed it to the oratrix. The oratrix at this time furnished her husband the sum of $10,000, being the balance necessary to make up the entire sum of $13,000, and out of the $10,000 so furnished Adams was paid whatever sum was paid him on the decree. Just what that sum was did not appear. The expressed consideration in the deed was $9,499.18.

On June 12th the oratrix executed and delivered to her husband, as manager of the Valido Marble Co., a writen agreement to re-convey to that company the property so deeded to her upon payment of the $13,000 advanced by her, with interest. And

subsequently, on the 12th day of November following, the ora-
trix and her husband joined in a conditional deed to the Valido
Company of the same tenor.  In both the written agreement and
the deed it was provided that the property should be insured for
the benefit of the oratrix, and that in the event of loss, if the par-
ties so agreed, the insurance money might be used in rebuilding
the premises.

Pursuant to this agreement the Valido Marble Company did
effect insurance for the benefit of the oratrix, and certain policies
which had been previously taken out for the benefit of Adams,
were by him transferred and assigned to the oratrix.

On the 21st day of July, 1889, one of the mills of the com-
pany was destroyed by fire.  The oratrix was willing to allow a
considerable portion of the money advanced by her to remain,
provided the property destroyed could be replaced and the secu-
rity kept good, and an agreement was made between the Valido
Marble Company and the oratrix that she should be repaid the
$3,000 which she had first advanced to apply on the execution,
and the interest on the whole up to October 1st, 1889, and that
the remaining $10,000 might be used by the company for the
purpose of rebuilding and continuing its business.

Agreeably to this arrangement the oratrix was paid the sum
of $3,000 and the interest on the whole to October 1st, 1889,
and the balance of the insurance money was turned over to the
Valido Company.

The mortgage of the defendants provided that the Valido
Company should keep the premises fully insured for the benefit
of the mortgagees.  The oratrix did not know of the existence of
this mortgage, but did know that there were bonds outstanding
against the company.  After the fire and before the arrangement
between herself and the Valido Company as to the insurance
money was perfected, the oratrix several times saw and conversed
with the defendants, Harmon and Cheney, and also with the de-
fendants, John B. Reynolds and Guy H. Reynolds, and no one

of these persons advised her of the existence of the mortgage to the defendants nor that it was her duty to apply the insurance money in liquidation of her indebtedness.

The money paid in liquidation of the loss was all by checks to the order of the oratrix and some other person, sometimes Adams and sometimes the Valido Company, and the entire amount was more than the amount of the oratrix's debt. The oratrix endorsed these checks and delivered them to her husband as the manager of the Valido Company and for it, in pursuance of their arrangement. The Valido Company at that time was hard pressed financially, and the husband of the oratrix apprehended that if it were known that any considerable sum of money was deposited to its credit it might be embarrassed by the beginning of trustee suits. He accordingly deposited in the Allen National Bank to the credit of his wife an amount of this insurance money equal to or exceeding the amount of the indebtedness of the Valido Company to her, and these sums were afterwards drawn out by him upon checks signed in blank by the oratrix. The oratrix did not know that the money was so deposited in her name nor did she know for what purpose the checks signed in blank by her and delivered to her husband were to be used.

Her husband testified, against the objection and exception of the defendants, without producing the checks, that the money so drawn out went to the use of the Valido Marble Company. He also testified against the objection and exception of the defendants, that he received these insurance checks from his wife as the manager of and in behalf of the Valido Marble Company, in pursuance of the arrangement which he, as the representative of such company, had previously made with her in respect of the disposition of the insurance money.

Soon after the fire, John B. Reynolds commenced suits against the oratrix and the Valido Marble Company, in which he claimed to recover a large amount, and in which the insur-

ance companies were summoned as trustees.  On the 23d day of September, 1889, there was a meeting at Albany, N. Y., at which the defendants, Guy H. Reynolds and John B. Reynolds, the husband of the oratrix, and several others, stock-holders and directors of the Valido Company, were present.  An agreement was there entered into respecting the suits above mentioned and certain other matters, by which it was provided that the oratrix was to convey the property to the company and receive from the insurance the amount due her.  The master found that William H. Johnson had no authority to represent the oratrix at this meeting, that she had no knowledge that any such meeting had been held until sometime afterwards, and never knew what the terms of the agreement were.

The defendants claimed that William H. Johnson was the general agent for the oratrix.  In respect to that claim the master's report contained the following statement:

" At the special request of the defendants, made since the draft of this report was submitted to them, the master reports that the oratrix, in one portion of her testimony, made use of the following language :

" Mr. Johnson has acted as my general agent ever since we were married and has authority to act as such.  Since my connection with the Valido Company he has done my business rather than myself."

Q.  By Mr. Moloney.—" You mean to state that he was your general agent in all matters? "

Ans.  " Yes."

But the Master further states that her evidence, when considered altogether, does not indicate, nor does the other evidence in the case show, that Mr. Johnson has ever been her general agent in the sense that he could bind her without her consent. They have lived a good portion of their married life in the city of New York, where the oratrix is the owner of more or less real estate.  The evidence shows that Mr. Johnson held a general power of attorney from his wife to collect rents upon her real estate in that city, and to deposit moneys so collected to her

Victoria A. Johnson *v.* Valido Marble Co. *et al.*

credit in some bank in which she kept an account; and that she sometimes signed checks and delivered them to him to use for purposes understood between them; she also, on many occasions, gave him special authority to act for her in matters agreed upon between them.

The agreements connected with the transactions involved in this proceeding were made by her personally with her husband, as the representative of the Valido Company, except the one between her and Adams, which was made through the intervention of her husband and Maynard; and he had no authority to do anything for her only as the different propositions were separately talked over between them and her consent and direction were obtained. In the matter of the insurance money, while it appears that her husband acted for her in the settlement with the insurance companies, it does not appear that he had authority, or that he tried to act in reference to the disposition of the money after it was received, nor that he had any authority to act for her in the settlement of any differences between herself and said Reynolds."

William H. Johnson was offered by the oratrix as a witness in her behalf. The defendants objected " to any evidence relating to transactions with his wife without it first appears that he had authority as general manager to enter into the same;" later " upon the ground that it did appear that the witness was the general agent of the oratrix, and that his knowledge was her knowledge."

*C. A. Prouty* and *Geo. E. Lawrence*, for the oratrix.

The oratrix is entitled to a lien agaist the premises for the entire amount advanced by her. The Adams liens were both superior to the liens of the defendants and amounted to more than $13,000. The arrangement with the oratrix was that she should advance $13,000 and take the security of Adams. When she advanced the last $10,000, the title had become absolute in Adams

and the defendants had no claim against the premises whatever. The defendants should not be allowed to assert such claim, except in virtue of and in accordance with the arrangement by which the oratrix advanced her money and took her security. The only right the defendants have is in virtue of the written agreement of the oratrix, and they can only insist upon that agreement as an entirety, if at all. In equity a lien may be treated as in force in reference to a subsequent lien, although legally the prior lien has been discharged. *Seymour* v. *Darrow*, 31 Vt. 122; *Thorpe* v. *Durbon*, 45 Iowa, 192; *Eggeman* v. *Eggeman*, 37 Mich. 436.

The oratrix had no knowledge in fact of the trust mortgage held by the defendants, and there is nothing in the case which can charge her with such knowledge. Jones Mort., s. 562; Pom. Eq. Jur., ss. 1188, 1199; *McDaniels* v. *Colvin*, 16 Vt. 300; *Seymour* v. *Darrow*, 31 Vt. 122.

The deposit of the insurance money in the Allen bank to the credit of the oratrix did not effect a payment of her indebtedness. There was no appropriation of the fund to that purpose. Jones Mort., ss. 904, 905.

The defendants made no objection to the testimony of Mr. Johnson, for that the husband could not testify in his wife's behalf.

*Butler & Moloney* and *H. A. Harman*, for the defendants.

The defendants have an equitable title to the insurance money by reason of the stipulation in their mortgage, that insurance should be effected in their behalf, although not in fact named in the policies. *Thomas* v. *Vonkapf*, 6 Gill & J. 372; *Prov. Co. Bank* v. *Benson*, 24 Pick. 204; *Nichols* v. *Baxter*, 5 R. I. 491; *Plympton* v. *Farmers*, &c. Co., 43 Vt. 497; *Miller* v. *Aldrich*, 31 Mich. 408; *Doughty* v. *Van Horn*, 29 N. J. Eq. 90; *Wheeler* v. *Ins. Co.*, 101 U. S. 439; *Ames* v. *Richardson*, 29 Minn. 330; *Nordyke M. Co.* v. *Gerry*, 112 Ind. 535; *Wilson* v. *Hakes*, 36 Ill. App. 539.

It was the duty of the oratrix to have applied the insurance money in payment of her indebtedness. Not having done so she cannot now set up that indebtedness as a lien prior to the mortgage of the defendants. *Kernochan* v. *Ins. Co.*, 17 N. Y. 428; *Cone* v. *Ins. Co.* 60 N. Y. 619, (624); *Pendleton* v. *Elliot*, 67 Mich. 496; *Blaisdell* v. *Stearns*, 16 Vt. 179; *Stafford* v. *Ballou*, 17 Vt. 329; *Lyman* v. *Lyman*, 32 Vt. 79; *Root* v. *Collins*, 34 Vt. 173.

The oratrix can at all events assert no lien in a greater amount than the sum due on the Adams decree. The transaction was in effect an assignment of that decree to her. *Dana* v. *Binney*, 7 Vt. 493; *McDonald* v. *McDonald*, 16 Vt. 630; *Dunshee* v. *Parmelee*, 19 Vt. 172; *Seymour* v. *Darrow*, 31 Vt. 122; *Chandler* v. *Dyer*, 3 ( Vt. 760.

The oratrix must stand affected with the knowledge of her husband, who acted in those matters as her agent. *Hart* v. *Far. & Mech. Bank*, 33 Vt. 252; *Abell* v. *Howe*, 43 Vt. 403, (409).

It was error to permit the husband of the oratrix to state in what capacity he received the checks for the insurance money. *Farmers & Mech. Bank* v. *Trans. Co.*, 23 Vt. 206; *Ball* v. *Farley*, 81 Ala. 288; *Fertilizer Co.* v. *Reynolds*, 79 Ala. 497; *Hamburg* v. *Wood*, 66 Tex. 168; *Pope* v. *McGill*, 12 N. Y. s. 306; *Fosdick* v. *Vanersdale*, 41 N. W. 931; *Doty* v. *Stanton*, 2 N. Y. s. 417; *Sowrie* v. *Salz*, 17 Pa. 232.

The opinion of the court was delivered by

MUNSON, J. The complainant's interest in the premises sought to be foreclosed was derived from one Adams, who held a first mortgage of the property, and obtained a decree thereon, which became absolute. The suit is defended on behalf of the holders of bonds secured by a mortgage subsequent to that of Adams. No question is made but that the complainant obtained by her deed from Adams' grantee security to the amount of the Adams decree. The claim is that as to the bondholders this demand was satisfied by the payment of insurance money.

The agreement in the second mortgage to keep the buildings insured for the benefit of the trustees, gave them an equitable lien upon the insurance money as against the Valido Marble Company. But the complainant would not be affected by the lien thus established unless she knew, or should have known, of the stipulation. The master finds that the complainant had no actual knowledge of the second mortgage nor of the stipulation contained in it; and it is contended in her behalf that the matters that came to her knowledge were not sufficient to charge her with the duty of inquiry.

The mortgage to the trustees was duly recorded; but it is well settled that the record of a subsequent mortgage does not charge a prior mortgagee with knowledge of it. The law does not throw upon a mortgagee the duty of examining the records from time to time to ascertain whether another has taken security upon the land covered by his mortgage. If the second mortgagee wishes to insure the retention of all the security for the satisfaction of the prior incumbrance, he must bring the knowledge of the second mortgage home to the holder of the first. 1 Jones Mortg. s. 562.

But the defendants insist that the complainant's knowledge of the fact that there were bonds in existence was sufficient to put her upon inquiry, and thus charge her with a knowledge of the mortgage and its contents. The bonds may have contained recitals the knowledge of which would have thus charged the complainant; but we think that information limited to the fact of their existence did not cast upon her the duty of inquiry. Notice of an incumbrance puts one upon inquiry as to the particulars of the indebtedness, but knowledge of the existence of a debt does not put one upon inquiry to ascertain whether it is secured.

It is further insisted that the husband of the complainant so far acted as her agent that his knowledge of the equitable lien arising from the stipulation in the second mortgage must be im-

puted to her. The master finds that the husband was the agent of the complainant only in such transactions as he was specially authorized to attend to. All the arrangements with Adams, including the provisions for the complainant's security, were made through one Maynard; but the master further reports that in making the arrangements by which the security of the complainant might be perfected, the complainant's husband acted as her agent. It is evident from the other findings that this can refer only to the procurement of the necessary papers. Was the husband's agency in that matter such as to charge the complainant with his knowledge of the existence of the second mortgage and the insurance clause contained it it? We think not. The existence of that provision in no way touched the completeness of the complainant's security. No events had yet transpired to make the provision of any importance to her. There was then nothing in existence upon which the lien could attach. We think it cannot be held that it was the duty of the husband, in rendering this service at this time, to call to mind and inform his wife of that provision.

The husband is also found to have acted for the complainant in settling with the insurance companies ; but he is found to have acted for the corporation and not for the complainant in the subsequent transactions concerning the money received. We do not think the agency as thus limited by the findings was such as will charge the complainant with her husband's knowledge. The adjustment of the insurance was a matter that was to be attended to in any event, whether the money was to be held by the complainant in satisfaction of her mortgage, or be suffered to pass into the hands of the mortgagor. The equitable lien had no bearing upon the complainant's right to make the collection, and therefore it was not the duty of her agent in the matter of the collection to inform her of it.

This being the complainant's situation as regards the equitable lien of the defendants, she could waive her right to retain

the insurance money without losing her security, unless she was precluded from doing so by the agreement entered into at Albany. The defendants insist that the complainant is bound by that agreement, and that its provisions were such that she could not suffer the insurance money to go into the hands of the corporation without giving priority to the defendants' security.

Among the participants in the Albany meeting were the defendants Reynolds, holders of a large amount of the bonds, and Johnson, the complainant's husband. It is not necessary to construe the terms of the memorandum then executed, nor consider the effect upon it of the failure of the defendant John B. Reynolds, to discontinue his suits; for the master finds that Johnson had no authority to represent the complainant at that meeting nor in the matters then adjusted, that she had no knowledge of the meeting until sometime after it was held, and was not then informed that it affected her interests. Certainly, if the memorandum itself had been submitted to her inspection, it would not have suggested to her the existence of any equitable lien upon the insurance money. Everything contained in it would have been explained by the fact that the payment of the insurance had been delayed by trustee suits in favor of John B. Reynolds.

It is further suggested in behalf of the defendants that the receipt and indorsement of the insurance checks by the complainant, and their deposit to her credit in the ordinary course, operated as a payment of the debt secured, and that in subsequently transferring the money to the corporation by her checks she made a new loan which stands unsecured, or at least subordinate to the defendants' mortgage. But before this was done the complainant, acting for herself, had agreed with her husband, acting for the corporation and by authority expressly given, that the insurance money should be taken by the company for use in the erection of new buildings; and what was done must be considered in connection with this fact. The insurance was payable

to the complainant and the checks for it would, in the regular course of business, be made payable to her order, and her endorsement would thus become necessary to enable the company to receive the money. This would not operate as a payment of the complainant's mortgage in the. absence of any intention on the part óf the parties to the· mortgage that it should so operate; certainly not in the face of their actual agreement to the contrary.

The deposit to the complainant's credit of the checks so endorsed, and the subsequent transfer of the funds to the company by checks signed by her in blank, were without her knowledge; and inasmuch as the entire proceeding by which she was put in the position of collecting the checks and afterwards transferring the avails to the company was without her authority, we do not see that the case stands differently from what it would if the checks had been deposited to the credit of the company when she delivered them properly endorsed to its agent.

Our attention has thus far been directed to that part of the complainant's demand which represents the Adams decree. It is now necessary to consider the situation of that portion of her claim which had its origin outside of the decree. The three thousand dollars advanced towards the payment of the execution was afterwards repaid from the insurance money ; and under the views above stated as to the complainant's relation to the equitable lien of the defendants, it is unnecessary to consider the status of this amount in regard to security and priority. But the ten thousand dollars subsequently advanced, for which the complainant seeks to sustain her lien, embraced a sum in excess of the amount of the Adams decree, and as to this sum further examination is necessary.

The execution was a lien superior to the defendants' security. It was paid before levy because of the arrangements entered into by the complainant with the Valido Marble Company and with Adams. It was understood that the complainant should

advance money sufficient to redeem the property from both liens, and hold the property as security for the entire disbursement. The two liens amounted to more than the sums advanced. The mortgage indebtedness was not paid until after the decree of foreclosure had become absolute. The defendants, having taken their conveyance while the proceedings were pending, were bound by the decree. 2 Jones Mortg. s. 1411. *Kopper* v. *Dyer*, 59 Vt. 477, 489. But for the complainant's understanding with Adams, the defendants would thus have lost all hold upon the property. No other right can have been left them than a right to compel the complainant to carry out her arrangement with Adams and the company, and recover the title. But she could not be compelled to carry out the arrangement without having the full benefit for which she had stipulated—security for both the sums advanced. She completed the payment to Adams as agreed, and obtained the title thereby, and afterwards conveyed the property to the company, conditioned upon the payment of the sums advanced. The defendants must now stand upon this conveyance; but they cannot stand upon it without recognizing the complainant's right to a repayment of the sums advanced for the satisfaction of prior securities under the agreement by which she procured the title.

The complainant is entitled to a decree in accordance with the foregoing views, unless the findings of the master are vitiated by the consideration of improper evidence received against objection.

The testimony of the complainant's husband was received as to transactions in which he was not her agent; and if objection was made upon that ground its admission was improper. It is insisted that the first objection noted to the husband's testimony was an objection of this character. We think it cannot upon any fair construction be so held. The complainant claimed to have dealt with the witness as the general manager of the Valido Marble Company, and the objection was evidently directed

Victoria A. Johnson *v.* Valido Marble Co. *et al.*

against any proof of his acts in behalf of the company without proof of his authority. The probability that an objection to the husband's competency would be made is perhaps the strongest argument in favor of the claim that this was intended to be such. But the defendants, for obvious reasons, wished to stand, and were standing, upon the ground that the complainant's husband was her agent in all matters; and the course of the objections as set forth in the exceptions reported fairly indicate that counsel proposed to assume that the fact of his general agency was already established by an expression to that effect in the complainant's own testimony. This affords an explanation of what might otherwise be considered an incomprehensible oversight on the part of counsel.

Johnson's testimony that the money drawn from the bank was used for the benefit of the company was properly received. A check may be the best evidence of its contents; but the expenditure of its avails may be shown without producing or accounting for it. The question here was not, to whom was the check made payable, but for whom was the money expended. The check might have been payable to Johnson personally, and yet the funds have been used for the company.

Johnson was the treasurer and general manager of the company, but the defendants claimed that in receiving the insurance checks from his wife he was acting as her agent. It was therefore proper for the complainant to meet this claim with the testimony of Johnson that he received the checks as the treasurer and agent of the company. Defendants' counsel cite *Farmers etc. Bank* v. *Champlain Transportation Co.* 23 Vt. 206, in support of their objection to this evidence. But the two cases are not alike. There it was sought to charge the person to whom the package was delivered with having received it in a certain capacity, by evidence of the mental purpose of the person who deliv-

ered it, in no way expressed or made known to the other. Here the person receiving the checks testified to the capacity in which he received them; and there being evidence of a previous arrangement for the delivery of the checks for a certain purpose, his testimony was no more than that he received the checks in accordance with that arrangement.

*Decree reversed and cause remanded with mandate.*