MURDOCK, Justice.
 

 Shelvia Graves appeals from a judgment in favor of Brookwood Health Services, Inc., d/b/a Brookwood Medical Center (“Brookwood”), on Graves’s claim alleging medical negligence against nurses at Brookwood. We reverse and remand.
 

 7.
 
 Facts and Procedural History
 

 On August 7, 2000, Graves was admitted to Brookwood’s Digestive Disease Center to undergo an upper and lower gastrointestinal exam (“GI exam”) as the result of problems she had been having related to ulcerative colitis, an inflammatory disease of the small intestine and colon. Graves had had several medical problems before the GI exam, including two prior colon surgeries, sinus problems, migraine headaches, and iron-deficiency anemia — the last of which required her to receive frequent vitamin B-12 shots and occasional blood transfusions. As a consequence, by Graves’s own admission in her deposition testimony, she had received several shots and been administered several IVs in the years before the GI exam. Graves’s latest IV was administered approximately a week before the GI exam. The nursing-admission summary prepared before the GI exam indicated that Graves had edema, or swelling, in her hands and fingers, a small cut on one finger of her right hand, and bruises on her upper arms. Graves related that she told the nurses who admitted her for the GI exam that the bruises were from previous IVs, but she stated that her hands and fingers were not swollen before the GI exam.
 

 Graves testified that the nurses at the Digestive Disease Center attempted to start an IV in her left arm,
 
 [1]
 
 which was unsuccessful, and then they inserted the IV in her left hand, which resulted in an infiltration.
 
 [2]
 
 According to Graves, the nurses then withdrew the IV from her left hand and inserted it into the back of her right hand.
 
 [3]
 
 Graves alleges that an infiltration occurred in her right hand and that she immediately began experiencing severe pain in her right hand, which caused her to start crying. Graves stated that she told the nurses that the IV was inserted incorrectly and that it was causing her pain, but they did not remove the IV. At that point, Dr. Gregory Champion entered the room and administered the injection of three successive drugs through the IV— first Versed, then Demerol, and finally Phenergan. Graves alleges that she told Dr. Champion that the IV was causing her pain but that he replied that they were
 
 *1220
 
 already behind in the procedure and that she would just have to endure it.
 

 Graves claims that Dr. Champion then began the GI exam by placing a tube with a tiny camera down her throat while she remained completely conscious.
 
 [4]
 
 Graves related that she continued to cry because of the pain in her hand caused by the IV and choked as the camera was forced down her throat. Once the camera was in place, Dr. Champion performed the examination and obtained biopsies of Graves’s bowel. The GI exam took 10 to 20 minutes.
 
 [5]
 

 Graves testified that upon completion of the procedure she looked down at her right hand and noticed that it was swollen “like a boxing glove.” Graves was transported to the recovery room after Dr. Champion ordered that a warm compress be placed on the infiltration site.
 
 [6]
 
 Graves testified that neither the swelling nor the pain in her right hand subsided while she was in the recovery room. Graves was discharged from Brookwood without receiving further treatment for her hand. Graves stated that Dr. Champion told her husband that the swelling in her hand would subside within 10 days.
 

 Graves stated that she visited an emergency room approximately two weeks later when the pain in her right hand still had not subsided. Graves subsequently began seeing other doctors when the emergency-room treatment failed to reduce the pain in her right hand and she experienced progressive loss of range of motion in that hand. She received nerve blocks in her right hand from one physician, which did not result in significant improvement. She was referred to orthopedic surgeon Dr. William Standeffer, who performed a surgery on Graves’s right hand on November 8, 2000. The surgery was not successful, and Graves thereafter received extensive treatment in repeated visits — including another surgery to her hand — from orthopedic surgeon Dr. John Buckley. Graves has not regained full use of her right hand, and she has been diagnosed with permanent nerve damage to the hand.
 

 On July 29, 2002, Graves and her then husband Michael
 
 [7]
 
 sued Brookwood, alleging that the nurses in the Digestive Disease Center had negligently inserted the IV in Graves’s right hand on August 7, 2000, which resulted in permanent nerve damage to that hand. On November 14, 2003, Brookwood filed its initial motion for a summary judgment, which it supported with Graves’s medical records from Brook-wood, an affidavit from nurse Ginger Azbik (the nurse who inserted the IV into Graves’s hand) stating that she had not breached the standard of care in inserting the IV, and a narrative of undisputed facts. Graves opposed the motion through an affidavit from Rebecca Langer, a nurse at the University of Alabama at Birmingham, who stated that in her opinion Brook-wood’s nurses had breached the standard of care, and excerpts from Graves’s deposition testimony. Based on these submis
 
 *1221
 
 sions, the trial court denied Brookwood’s motion for a summary judgment.
 

 Following the denial of the summary-judgment motion, discovery continued, during which several depositions were taken, including the depositions of Nurse Langer, Dr. Standeffer, and Dr. Buckley. Dr. Buckley was initially deposed on November 11, 2004. In February 2008, a video deposition of Dr. Buckley was taken.
 

 The day after the transcript of Dr. Buckley’s video deposition was completed, Brookwood filed a renewed motion for a summary judgment, which it supported with excerpts from the deposition of Dr. Standeffer and Dr. Buckley’s video testimony. The motion noted that Graves previously had identified orthopedic surgeons Dr. Standeffer and Dr. Buckley as the physicians qualified to speak to the issue of causation. Brookwood noted that Dr. Standeffer in his deposition testimony testified that he did not think it was “plausible” or “reasonable” that the IV infiltration caused Graves’s injury. It also highlighted the fact that Dr. Buckley in his video testimony stated that it was possible, but not probable, that the IV infiltration had caused the nerve damage in Graves’s right hand. Based on this evidence, Brookwood contended that Graves had failed to establish a prima facie ease of medical negligence.
 

 Graves responded to the motion by citing Nurse Langer’s affidavit and excerpts from Dr. Buckley’s 2004 deposition. She noted that Dr. Buckley had stated in 2004 that it was probable that the TV infiltration had caused her injury. Brookwood’s motion was set for a hearing on March 7, 2008.
 

 Brookwood filed a motion to strike Nurse Langer’s affidavit — to the extent that Graves sought to use it to establish causation — on the ground that a registered nurse was not qualified to testify as an expert on medical causation in a medical-malpractice action. Brookwood also moved to strike Dr. Buckley’s 2004 deposition on the ground that it was supplanted by the 2008 video deposition.
 

 During a hearing on March 7, 2008, the trial court did not rule on Brookwood’s renewed motion for a summary judgment. Instead, the trial court indicated that it wanted to review the testimony from both of Dr. Buckley’s depositions before ruling on the motion. On March 10, the date that had been set for trial, the trial court indicated that it wanted to proceed to trial provided that Graves would be presenting further evidence of causation. Also at this time, Graves conceded that Nurse Lan-ger’s testimony could not be used to establish causation, and she withdrew Dr. Standeffer as a witness for purposes of causation. Thus, only Dr. Buckley’s testimony remained as evidence to establish causation. The parties then proceeded to jury selection.
 

 On March 11, 2008, the trial court heard extensive arguments concerning the parties’ motions
 
 in limine.
 
 During this hearing, the trial court ruled that Graves could not introduce certain medical literature concerning the effect of the drug Phener-gan,
 
 [8]
 
 which Graves apparently intended to use as evidence regarding causation. Brookwood then urged the trial court to reconsider its allegation in its renewed motion for a summary judgment that the evidence of causation was insufficient because Graves had conceded that she had no causation evidence other than the depo
 
 *1222
 
 sition testimony of Dr. Buckley. Following an
 
 in camera
 
 meeting among the trial court and the parties’ attorneys, the trial court stated the following in open court:
 

 “The Court having considered the deposition testimony of Dr. Standeffer, Dr. Buckley, both depositions of Dr. Buckley, rules that [Brookwood’s] request for judgment as a matter of law should be granted. I think [Graves] and [Brook-wood] have both stipulated as to those depositions. The Court, upon review of those, finds [Brookwood’s] motion is going to be granted.”
 

 Following this pronouncement, the trial court dismissed the jury.
 

 On April 22, 2008, the trial court entered a written order, which provided, in pertinent part:
 

 “[Graves] failed to meet the standard of substantial evidence required by Alabama Law, indicating that the alleged negligence probably caused the injury claimed by the plaintiff. Dr. John Buckley and Dr. William Standeffer were two orthopedic surgeons who treated [Graves]. Dr. Buckley, by way of his trial testimony, and Dr. Standeffer, by way of his deposition, testified that they cannot state the infiltration at issue in this cause was the probable cause of [Graves’s] hand injury, only that it is a possible cause. (Buckley deposition III, p. 42; Standeffer deposition, p. 100).
 

 “Absent substantial evidence demonstrating that the alleged negligence is the probable cause of the claimed injury, a judgment as a matter of law is due to be entered in favor of Brookwood Hospital.”
 

 Graves appeals from this judgment of the trial court.
 

 II. Standard of Review
 

 Though the trial court styled its order as relief based on Brookwood’s “renewed motion for judgment as a matter of law pursuant to Rule 50 of the Alabama Rules of Civil Procedure,” the motion before the trial court was, in fact, Brook-wood’s “Renewed Motion for Summary Judgment.” Moreover, the trial court entered its oral order before Graves presented any portion of her case to the empaneled jury. Therefore, the trial court actually entered a summary judgment in favor of Brookwood as opposed to a judgment as a matter of law. See Rule 50(a), Ala. R. Civ. P. (providing for a “judgment as a matter of law” only after “a party has been fully heard on an issue”). This distinction makes no difference in terms of our standard of review because “[t]he standard by which we review a ruling on a motion for a [judgment as a matter of law] is ‘ “materially indistinguishable from the standard by which we review a summary judgment.” ’ ”
 
 Bailey v. Faulkner,
 
 940 So.2d 247, 249 (Ala.2006) (quoting
 
 Flint Constr. Co. v. Hall,
 
 904 So.2d 236, 246 (Ala.2004), quoting in turn
 
 Hathcock v. Wood,
 
 815 So.2d 502, 506 (Ala.2001)).
 

 “ “We apply the same standard of review [in reviewing the grant or denial of a summary-judgment motion] as the trial court applied. Specifically, we must determine whether the movant has made a prima facie showing that no genuine issue of material fact exists and that the movant is entitled to a judgment as a matter of law. Rule 56(c), Ala. R. Civ. P.;
 
 Blue Cross & Blue Shield of Alabama v. Hodurski,
 
 899 So.2d 949, 952-53 (Ala.2004). In making such a determination, we must review the evidence in the light most favorable to the non-movant.
 
 Wilson v. Brown,
 
 496 So.2d 756, 758 (Ala.1986). Once the movant makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to produce “substantial evidence” as to the
 
 *1223
 
 existence of a genuine issue of material fact.
 
 Bass v. SouthTrust Bank of Baldwin County,
 
 538 So.2d 794, 797-98 (Ala.1989); Ala.Code 1975, § 12-21-12.’ ”
 

 Mutual Assurance, Inc. v. Schulte,
 
 970 So.2d 292, 295 (Ala.2007) (quoting
 
 Dow v. Alabama Democratic Party,
 
 897 So.2d 1035, 1038-39 (Ala.2004)).
 

 III. Analysis
 

 “To have a valid claim under the Alabama Medical Liability Act, the [plaintiff] must provide evidence indicating that the negligence alleged is the proximate and
 
 probable
 
 cause of [the plaintiffs] injury; a mere possibility or one possibility among others is insufficient to meet the burden of proof.”
 
 Lyons v. Vaughan Reg’l Med. Ctr., LLC,
 
 23 So.3d 23, 28-29 (Ala.2009) (citing
 
 Sorrell v. King,
 
 946 So.2d 854, 862 (Ala.2006)). Graves contends that testimony from Dr. Buckley’s 2004 deposition constitutes substantial evidence that the IV infiltration probably caused her injury. Brookwood counters that, in context, Dr. Buckley’s 2004 deposition testimony, when considered with his 2008 video testimony, does not establish substantial evidence of causation.
 

 The pertinent portions of Dr. Buckley’s 2004 deposition provide as follows:
 

 “Q. When did y’all first see [Graves]?
 

 “A. Well, the first time I saw her was on December 5, 2000.
 

 “Q. All right sir. And did you obtain a history at that time?
 

 “A. Yes. For reasons which had to do with the nature of the condition, I didn’t shall we say, explore too deeply the circumstances surrounding the original injury because that had happened about five months previously. And she’d also already been operated on. So I didn’t think that belaboring those points was going to be particularly helpful.
 

 “But my understanding was she had an I.V. which infiltrated and which resulted in some dorsal fibrosis and that she had undergone an extensor tendon tendolysis and release of some of the metacarpophalangeal joint capsules, and also had an intrinsic release of the right hand.
 

 [[Image here]]
 

 “Q. The history of the I.V. infiltration was that referring back to August 2000 at Brookwood Hospital?
 

 “A. That was my understanding, yes.
 

 [[Image here]]
 

 “Q. Dr. Buckley, do you have an opinion as to whether the I.V. infiltration in August of 2000 probably caused the injury and damage that you saw with regard to her right upper extremity?
 

 [[Image here]]
 

 “A. Well, as you are aware,
 
 I have only history to go by.
 

 “Q. Yes, sir.
 

 “A. And since I had seen her after several things had taken place, I’m somewhat removed from the original event. But that was the only history th[at] I ever achieved, I ever obtained, and I didn’t ever receive any information to the contrary. So I have to assume that that was the signal event.
 

 “Q. And when you say ‘signal event,’ what do you mean by that?
 

 “A. That was the point at which her discomfort began.
 

 [[Image here]]
 

 “Q. [Graves’s counsel] asked you about whether you had made a determination as to whether the I.V. infiltrations at issue in this case probably caused the injury that you, Dr. Standeffer,
 
 *1224
 
 and Dr. Spruill[
 
 9
 
 ] all treated. And first off I want to ask you a little bit about that line of questioning.
 

 “Early on you indicated to us that the information contained in your chart about the patient’s problem with which she presented being related to an infiltration was by way of the patient’s own history; is that correct?
 

 “A. Correct.
 

 “Q. Your interest is not in making some forensic determination about what caused the ultimate injury?
 

 “A. Correct. Insofar as the lack of such information doesn’t impinge upon the treatment I’m delivering. And because I was seeing her at a time several months from the inciting event, and since the changes that had established — had been established was chronic, it didn’t really make a great deal of difference what the original circumstance was. What I was confronted with was a rather aggressive dorsal fibrosis that was, as it turns out, largely not amenable to treatment.
 

 “Q. Yes sir. And from your perspective, your concern was treating a condition that showed up on your doorstep, so to speak, and not determining ultimately what caused it?
 

 “A. Correct.
 

 “Q. And you are not coming in here today to offer any testimony to the effect that you now believe that what occurred at Brookwood Hospital in August 2000 caused the injury that you treated; is that correct?
 

 “A. Correct. As I said earlier, that was what I was told, and that was reasonable and consistent with the circumstances as they presented themselves to me. And so I didn’t feel it necessary to explore that further.
 

 “Q. Sure. And let me ask you this, Dr. Buckley. Did Mrs. Graves give that history to you at the time she first presented about the I.V. infiltration, or was it by the way of some other documentation?
 

 “A. No. I believe, judging from the dictation which I prepared at the time of the original visit, that information came to light during our initial contact.
 

 “Q. And any indication in the chart that there may be some potential relationship between the injury that you were treating and the infiltration that occurred is not meant to reflect a determination by you that there is a causal relationship, but instead is intended to reflect patient-history information?
 

 “A. I think I agree with that statement.
 

 “Q. I know that was somewhat of a convoluted question. And the reason I’m asking it is—
 

 “A. May I say that I do not have an opinion independent of the information I received from Mrs. Graves about the cause of her problem.
 

 “Q. I see.
 
 So you would not sit here today and say that the infiltration probably caused the injury which you treated?
 

 “A. Well, I guess that’s actually what I would say. But I would say it because of the information that I obtained from my ongoing discussions with Shelvia Graves.
 

 “Q. Okay. So
 
 based on patient history
 
 and—
 

 “A.
 
 Yes.
 

 
 *1225
 
 “Q. —based on the idea that you haven’t independently investigated—
 

 “A. Correct.
 

 “Q. —and have no other information with which to compare?
 

 “A. That is correct.
 

 [[Image here]]
 

 “Q. What in your opinion would cause the type of scar tissue and fibrosis that Dr. Standeffer described that he encountered?
 

 “A. Well, I think I could answer that more accurately by saying that the infiltration of some irritating substance could. I don’t know that it necessarily would, and certainly there are other potential causes as well. So I don’t think there’s anything that is sufficiently specific about his operative findings that would allow one to say with certainty that the condition could have been caused only by the event in question. But I think to establish such a relationship is probably reasonable.
 

 “Q. All right sir. The history that Shelvia Graves gave you about the infiltration of the I.V., or the extrava-sation, was consistent with the injury Dr. Standeffer described and the injury you also found when you went in to do your surgery?
 

 “A. Well, it is certainly consistent with what Dr. Standeffer described. As you pointed out, or as was pointed out earlier, by the time I saw her I don’t think it would be possible to distinguish between postoperative changes and the original injury.
 

 “Q. All right, sir. And if we assume that there was no other history of injury, damage, or trauma to her right hand other than this I.V. that extrava-sated, assuming that to be true, I’ll ask you
 
 whether or not it is probable that the I.V. infiltration caused the injury?
 

 [[Image here]]
 

 “A.
 
 Again making all of the assumptions that we’re aware of, I think that is a reasonable statement.
 

 [[Image here]]
 

 “Q. Just briefly, Dr. Buckley.
 
 Assume that there was no prior injury, damage, or trauma to the right hand; assume that when [Graves] went into the Brookwood Hospital, she had not experienced any pain or discomfort with regard to her right hand; assume that the I.V. was inserted and that she started experiencing severe burning pain in her right hand subsequent to the I.V. insertion, and that there was swelling of the right hand that was grossly apparent; and assume that her symptoms with regard to her right hand persisted from that point forward.
 

 “If we make those assumptions as being true, I’ll ask you whether or not the I.V. is probably the source or etiology of her injury and damage in her right hand?
 

 [[Image here]]
 

 “A.
 
 Yes.”
 

 (Emphasis added.)
 

 The pertinent portions of Dr. Buckley’s 2008 video testimony provide as follows:
 

 “Q. Dr. Buckley, given the patient history in this case as well as your own knowledge and expertise in hand injuries and the clinical features that you encountered during your surgery on [Graves], do you have an opinion as to whether the IV infiltration in August of 2000 most probably is the source or signal event of this injury?
 

 [[Image here]]
 

 “A. The history that I was provided certainly suggests a relationship in
 
 *1226
 
 terms of time between the onset of the process which resulted in my seeing her and operating upon her and subsequently treating her and an event involving an IV infíltrate. To the extent that temporal connection is accurate and to the extent that nothing else happened which represents a plausible explanation for the process, it would seem reasonable to implicate the infiltration. As I said earlier, I don’t think there’s anything about the situation I encountered that was characteristic of an IV infiltration.
 

 “Q. Given everything that you know sitting here today, I take it that it is reasonable to conclude that the source of her injury is the IV infiltration?
 

 [[Image here]]
 

 “A. The — I don’t think that I can say anything more than I just said. I think that it
 
 is
 
 — the
 
 relationship certainly is possible, but whether or not it is probable is another matter, and I don’t think I can make a supportable statement in that regard.
 

 “Q. Doctor, let me just — I wanted to refer back to the deposition that you gave in this case some time ago and see if I can refresh your recollection to some extent.
 

 “On page 32, the defense lawyer was asking you questions, and near the bottom of page 32, he stated or he questioned you: ‘So, you would not sit here today and say that the infiltration probably caused the injury which you treated?’ And your answer, ‘Well, I guess that’s actually what I would say, but I would say it because of the information that I obtained from my ongoing discussions with Shelvia Graves.’ Is that still your testimony today?
 

 “A.
 
 Yes. In other words, the relationship upon which this statement is based is largely historical, not based upon any sort of forensic assessment of the surgical findings or histologic findings, just that she said this is what happened, and I assumed that was correct.
 

 “Q. I understand.
 

 “And you didn’t undertake any forensic examination to determine the cause because, quite frankly, you were more interested in caring for her and treating her and seeing what you could do to make her life better; is that fair?
 

 “A. Correct.”
 

 (Emphasis added.)
 

 It is apparent from the deposition testimony that Dr. Buckley testified in 2004 that the IV infiltration probably caused the injury to Graves’s right hand. Dr. Buckley stated that he did “not have an opinion independent of the information I received from Mrs. Graves about the cause of her problem,” but this is not surprising given that Dr. Buckley was not the first physician to see Graves following the IV infiltration.
 

 “ ‘The expert opinion testimony of a physician-witness as to the condition, diagnosis, prognosis or otherwise of his patient, whom he has personally examined, may be based in part on the history of the case, including both his present and past condition and symptoms as related by the patient to the physician-witness in connection with, and as part of, the examination.’ ”
 

 Drummond Co. v. Boshell,
 
 641 So.2d 1240, 1243 (Ala.1994) (quoting Charles W. Gamble,
 
 McElroy’s Alabama Evidence
 
 § 110.01(1) (4th ed.1991)).
 

 Among other things, Brookwood contends that Dr. Buckley’s 2004 deposition testimony does not constitute substantial evidence of causation because, it argues,
 
 *1227
 
 Dr. Buckley made it clear in both the 2004 deposition and the 2008 deposition that his conclusion was based on patient history and was not meant to be a forensic assessment of causation. Medical-expert testimony is not rendered invalid, however, simply because it is based upon a patient’s history.
 

 “ ‘The law recognizes that, in the practice of medicine, a diagnosis of the ailment may include a personal examination of the patient by all the methods known to science, and also the history of the case, as given by the patient or other examining physician.
 

 “ ‘This history may include a statement of present and past symptoms.... A professional opinion as to the nature, cause, and extent of the ailment, based upon all these matters in connection with and as part of the personal examination of the patient, is competent evidence.’ ”
 

 Tidball v. Orkin Exterminating Co.,
 
 583 So.2d 239, 241 (Ala.1991) (quoting
 
 Stale Realty Co. v. Ligon,
 
 218 Ala. 541, 543-44, 119 So. 672, 674 (1929)).
 

 It is true that the facts underlying a patient’s medical history may be — and in this case are — in dispute, but the veracity of the history recounted by a patient is a matter for the jury’s determination. Dr. Buckley, like any physician basing an opinion on patient history, was being asked to assume that Graves had accurately related her medical history and, based on that assumption, to give his opinion as to whether the IV infiltration probably caused Graves’s injury. On this basis, Dr. Buckley concluded in his 2004 deposition that it was the probable cause.
 

 Dr. Buckley’s testimony in this regard is no different than if he was to offer his opinion in response to hypothetical questions based upon evidence in the record. An expert witness “may give an opinion based upon hypothetical questioning as to facts already in evidence, or evidence to be subsequently admitted.”
 
 Crawford v. Hall,
 
 531 So.2d 874, 875 (Ala.1988). In like manner, Dr. Buckley accepted the history Graves provided him and formed an opinion — based upon that information, her condition, and his medical knowledge— that the IV infiltration probably caused Graves’s injury.
 

 In fact, Dr. Buckley offered the same conclusion in response to hypothetical questions asked by Graves’s counsel. Brookwood contends that Dr. Buckley’s opinion elicited as a result of the hypothetical questions is not reliable because “the expert may not give his opinion unless those facts have been properly hypothesized before the expert witness.”
 
 Boshell,
 
 641 So.2d at 1243. Brookwood argues that the hypothetical questions posed to Dr. Buckley did not properly hypothesize the facts because, it says, the questions asked him to assume that “there was no prior injury, damage, or trauma to the right hand.” Brookwood notes that there is evidence in the record indicating that Graves’s hands were swollen before the IV was inserted.
 

 Brookwood’s argument again mistakenly assumes that medical-expert testimony does not establish substantial evidence of causation when it is based upon facts that are in dispute. A “properly hypothesized” question need not be based upon undisputed facts; it is enough that it is based on “facts already in evidence, or evidence to be subsequently admitted.”
 
 Crawford,
 
 531 So.2d at 875. The questions posed to Dr. Buckley accurately reflected evidence in the record submitted by Graves. The fact that there is also evidence in the record that conflicts with Graves’s testimony simply reflects the dispute that must be resolved by a jury. The manner in which the jury resolves the conflict will affect the
 
 *1228
 
 ultimate viability of Dr. Buckley’s opinion, but the factual dispute does not affect whether a conclusion drawn by Dr. Buckley based upon Graves’s version of the facts constitutes substantial evidence for purposes of the summary judgment entered here.
 

 Brookwood further contends that regardless of how Dr. Buckley’s 2004 deposition testimony is considered, his 2008 video deposition settles the matter because he testified in the latter deposition merely that it was “possible,” rather than “probable,” that the IV infiltration caused Graves’s injury. Our cases make it abundantly clear, however, that a portion of the testimony of the plaintiffs expert cannot be viewed “abstractly, independently, and separately from the balance of his testimony.”
 
 Hines v. Armbrester,
 
 477 So.2d 302, 304 (Ala.1985). See, e.g.,
 
 Downey v. Mobile Infirmary Med. Ctr.,
 
 662 So.2d 1152, 1154 (Ala.1995) (noting that “[t]his Court has consistently held that the testimony of an expert witness in a medical malpractice case must be viewed as a whole, and that a portion of it should not be viewed abstractly, independently, or separately from the balance of the expert’s testimony”). In other words, Dr. Buckley’s 2008 video deposition testimony must be viewed in its entirety, as well as in context with the testimony he provided in his 2004 deposition.
 

 It is true that Dr. Buckley stated in his 2008 video deposition that “the relationship [between the IV infiltration and Graves’s injury] certainly is possible, but whether or not it is probable is another matter, and I don’t think I can make a supportable statement in that regard.” When confronted with his statement of probability from his 2004 deposition, however, Dr. Buckley defended his 2004 testimony, explaining that “the relationship upon which this statement [that the IV infiltration probably caused the injury] is based is largely historical, not based upon any sort of forensic assessment of the surgical findings or histologic findings, just that she said this is what happened, and I assumed that was correct.” Thus, Dr. Buckley stated in 2008 — as he did in 2004 — that assuming Graves’s patient history was accurate, he still believed that the IV infiltration probably caused her injury. In other words, Dr. Buckley’s 2008 video deposition testimony does not contradict the deposition testimony he provided in 2004.
 

 “ ‘We are to view the [expert] testimony as a whole, and, so viewing it, determine if the testimony is sufficient to create a reasonable inference of the fact the plaintiff seeks to prove.’ ”
 
 Giles v. Brookwood Health Servs., Inc.,
 
 5 So.3d 533, 550 (Ala.2008) (quoting
 
 Hines,
 
 477 So.2d at 304-05). Viewing Dr. Buckley’s testimony as a whole and viewing the evidence in the light most favorable to Graves, we conclude that Graves demonstrated the existence of a genuine issue as to medical causation and that the trial court’s summary judgment against her on this basis therefore was in error.
 

 TV. Conclusion
 

 We reverse the judgment of the trial court, and we remand the cause for further proceedings.
 

 We also note that Graves has filed a motion to strike what she calls Brook-wood’s “Sur-Reply Brief.” Graves refers to a letter Brookwood sent to the office of the clerk of this Court after briefing closed in this case in which it alerted the Court to a case the Court released after briefing closed, which Brookwood claimed “deal[t] directly with the issue of sufficiency of causation testimony in a medical malpractice action and is directly on point with
 
 *1229
 
 Brookwood’s position in this appeal.”
 
 [10]
 
 Graves’s primary objection to the submission by Brookwood appears to be the inclusion of responses to arguments and statements Graves made in her reply brief. We find Graves’s motion to strike well taken, and we therefore grant it.
 

 MOTION TO STRIKE GRANTED; REVERSED AND REMANDED.
 

 COBB, C.J., and LYONS, STUART, and BOLIN, JJ., concur.
 

 [1]
 

 . The purpose of the IV was to inject a succession of drugs that would induce conscious sedation of the patient for the duration of the GI exam.
 

 [2]
 

 . An infiltration occurs when an IV is not properly inserted into the vein and the fluid in the IV is injected into tissue surrounding the site of the IV.
 

 [3]
 

 .The procedure record for Graves’s GI exam does not indicate that the nurses had any problems starting the IV; in addition, it states that the IV was inserted in Graves’s left hand and that it remained there throughout the GI exam.
 

 [4]
 

 . The procedure record indicates that Graves was sedate following the administration of the last drug dosage and that she remained so until she awoke in the recovery room.
 

 [5]
 

 . Dr. Champion's notes on the procedure do not indicate that there were any problems sedating Graves or that Graves expressed any feeling of discomfort during the GI exam.
 

 [6]
 

 . The procedure record noted that an infiltration had occurred in Graves’s
 
 left
 
 hand and that a warm compress was placed on the infiltration site.
 

 [7]
 

 .Michael Graves subsequently filed a motion to dismiss his loss-of-consortium claim because he was no longer married to Shelvia Graves and no longer "wished to participate in this lawsuit.” The trial court granted the motion, leaving Graves as the sole plaintiff.
 

 [8]
 

 . The trial court concluded that Graves was attempting to add a new claim to her complaint involving the drug Phenergan though she never amended her complaint to include allegations concerning the use of a specific drug by Brookwood.
 

 [9]
 

 . This is a reference to Dr. Wesley Spruill, a pain-management specialist.
 

 [10]
 

 . The case noted by Brookwood is
 
 Thompson v. Patton,
 
 6 So.3d 1129 (Ala.2008), and although it addresses the issue of causation testimony, it provides no more assistance in deciding this case than several other cases that had already been cited by the parties in their briefs.